McMahon, Respondent, v. Bergeson and another, Appellants.*

*January 5—February 2, 1960.*

* Motion for rehearing denied, with $25 costs, on April 5, 1960.

For the appellants there was a brief by *Stephens, Bieberstein, Cooper & Bruemmer* and *Paul C. Gartzke,* all of Madison, and oral argument by *Mr. Gartzke.*

For the respondent there was a brief and oral argument by *Vernon Molbreak* of Madison.

DIETERICH, J. The issues involved here are upon the plaintiff's damages for personal injuries.

Joseph McMahon, the plaintiff, testified that he was involved in an accident on March 22, 1957. That he is employed by the National Distillers Products Company as a salesman. The company manufactures alcoholic beverages. The products are sold to wholesalers. McMahon works with the salesmen in the promotion and sale of the merchandise. The plaintiff further stated: ". . . As soon as I entered the intersection I heard a screech and . . . I knew I was in trouble at that moment. I tried to veer my car to the left, but all of this happened so fast that I had no opportunity to do anything to avoid the accident, and then I was hit in the front, the door and the right rear fender. The front part of the defendant's car struck my car. . . . The next thing I remember is standing next to the car which was about 90 feet off the intersection turned at an angle, . . . I just

stood there. I had no control of myself. The policeman came up to me after while and asked me if I was the other party and I said, 'Yes.' I started to cry and tremble. He then took me to his car. (At this point witness hesitated, tears came to his eyes, and he had difficulty in talking.) They took me in the police car to the hospital. I had a pain in the back of my head, my head was aching. I went to the Madison General Hospital and was given emergency treatment. They called my family physician, Dr. Gerald Derus, and he prescribed that they give me a shot in the arm which they did and it quieted me down. . . . I was then taken home and put to bed. I next saw my physician sometime at the end of that following week, Thursday or Friday." He further testified that he also had seen Dr. Berglund and Dr. Smith.

The following questions were asked Mr. McMahon:

"*Q*. Between March 22, 1957, and January 10, 1958, you didn't have to take off any whole days, is that right, but you have had to take off whole days since January 10, 1958? *A*. Yes, I have.

"*Q*. How many whole days have you had to take off since January 10, 1958? *A*. I can't give the exact number to that. It may be ten or twelve or fourteen, in there.

"*Q*. . . . You don't have any trouble sleeping, do you, sir? *A*. No, I don't."

Officer Crary was a witness to the accident and testified that he saw the plaintiff fly out of the car, land on his feet, and sink to his knees. He did not see if the plaintiff struck his head. He saw the plaintiff stand next to his car for a short time and the plaintiff lost control of himself, commenced crying, shaking, and complained of a headache.

The plaintiff was taken to the Madison General Hospital and the emergency-room report shows under physical findings that plaintiff was a hyperactive male, crying and hyperventilating. Dr. Derus, the plaintiff's family doctor, was

called by the hospital at the request of plaintiff, but did not go to the hospital. Plaintiff was discharged from the hospital fifty-five minutes after entry.

Dr. Derus saw the plaintiff March 25, 1957, and at various times thereafter. On March 25th the plaintiff complained of being nervous, pain in the back of his neck, feeling somewhat unreal, and had trouble with clouding of his mind, as he called it. The doctor testified that, "I examined his cervical spine, his reflexes, and those things were good with an ordinary neurological examination. At that time I suggested that we get further X rays of his neck and entire spine, which were done." The X rays revealed no evidence of fracture or dislocation of the cervical spine and back. The doctor next saw the plaintiff on April 10, 1957, at which time the complaints were quite similar to those previously mentioned, although plaintiff complained of more cloudiness of mind and doing things that were not like him. The doctor prescribed sedatives and drugs to release the muscle spasms. On April 10, 1957, the doctor recommended that the plaintiff be further evaluated and treated by Dr. Wixson, a bone specialist, and subsequent to that plaintiff went to the doctor's office for deep-heat treatments to the back of his neck. The doctor then referred the plaintiff to Dr. Berglund, a neurologist.

Dr. George Berglund, a neurologist, testified on behalf of the plaintiff. He stated that he limits his practice to the diseases of the brain and spinal cord, including injuries and tumors. He stated that he was asked to see Mr. McMahon at the request of Dr. Wixson, a bone specialist in Madison, and that he first saw Mr. McMahon on April 12, 1957. McMahon complained on that date of "headache, burning pain in back of his neck, pain in the back between shoulder blades, pain in the low back, and nervousness." The doctor stated: "I reviewed his past history to see if there was any

previous serious illness or serious injury and there was none. He told me he felt perfectly well prior to the time of an automobile accident occurring on March 22, 1957. I am always interested in getting the patient's own words as to what they remember of the accident, because I am trying to determine whether or not there was a loss of consciousness or period of forgetfulness. If you keep that in mind I think we can evaluate the statement that he gave me, 'I remember the impact and the next thing I remember I was standing next to the car. I just stood there, I was serene, you might call it, and then there was a few people who showed me marks on my coat. I presume I was thrown from the car; I can only presume that. In the space of about five minutes I began to shake, convulse, and cry. I had no control of my facilities at all.' It was my impression then that there was a period of a few moments in which he did not recall what happened. We then went on to develop the symptoms he was having, having him describe them to me, and he went on to say that the burning sensation in back of his neck spread up to the back of his head, and 'the rest of my head is just one big headache; it's like a foggy feeling, not a pain and nothing sharp.' I went on to ask him if he thought the pains had improved, gotten worse, or remained the same, and he said if anything they had progressed. He also complained of some pain in the low back, at belt-line level. He went on to say this did not bother him very much except that when he would lean over that he would get the pain. He also described some discomfort being between the shoulder blades. He described this as a 'dull sensation,' and this had been present since the accident. He also said that on sudden postural changes, that is, bending over or rising up quickly from a chair he was aware of a feeling of dizziness which appeared to be a sensation of lightheadedness rather than true spinning sensation."

*Neurological Examination.*

"The examination is designed to see whether or not there has been any residuals of damage to the brain or spinal cord or the nerves that come from the spinal cord. I carried out this examination; he complained of some tenderness in the back of the head and scalp. Aside from that I found no abnormality. The findings were normal. He was a bit tremulous as he outstretched his fingers, but I could find no evidence that there was anything residual of brain damage on my examination. We arranged for him to have an electrical brain-wave test at the University of Wisconsin, and this was done and was reported to be normal. Skull X rays were taken at Madison General Hospital and they too were normal. It was my opinion at the completion of the first examination that based upon his story to me as I quoted to you, there was this period of loss of consciousness or forgetfulness which lasted a matter of some moments or minutes. On that basis I had to conclude that he did have a brain concussion. A brain concussion by definition is a transitory disturbance of brain function. In other words, this period of unconsciousness was this transitory disturbance and then as he regained consciousness or regained his memory, then the brain functioned normally. There was also evidence of rather-marked nervousness and the nervousness can give rise to muscle tension and this in turn aggravate the symptoms such as one might get if there is a brain concussion or even the tightness of muscles which frequently follows a head being jarred. I followed Mr. McMahon at intervals, and I saw him last on June 3d of this year. The symptoms of dizziness, this lightheadedness on sudden postural change is a very common symptom after a brain concussion, and this symptom gradually becomes less and less noticeable until it finally clears. That has been the case of Mr. McMahon. So I felt that in so far as the brain concussion was concerned

that he showed progressive improvement, but as I followed him and saw him from time to time it became evident or remained evident that symptoms of nervousness were very prominent, and for that reason I suggested at first that we'd like to have him seen by a specialist in this regard and arrangements were finally made for him to be seen by Dr. Max Smith in regard to his nervousness."

*Psychiatric Examination.*

Dr. Max Smith, a psychiatrist, testified on behalf of the plaintiff. A synopsis of the doctor's testimony follows:

"I first saw him May 21, 1958. I kept a record of the plaintiff's treatment and have that record with me. . . . When I first saw Joseph McMahon he stated that in March of the year previous he had had an automobile accident in which he had been temporarily knocked unconscious. . . . Then he came to or was suddenly aware, when he regained his awareness, he was standing by the car and felt a certain serenity but at the same time rather confused and befuddled. He states that when he noticed suddenly an older man lying on the ground unconscious and bleeding that he fell all apart, began to shake and cry and was unable to control himself. He states that he was at that time finally taken to the Madison General Hospital where an intern tried to talk him into regaining control of himself and he was unable to do so, and the intern then gave him a shot of some sort . . . following which he began to calm down and was able to go home. And he stated at that time since the automobile accident he had had pain in the back of the neck, that he had had some low back pain, and that he had felt tremendously nervous and agitated and he described this agitation as a rather-constant feeling of boiling inside. He said that also in addition to the constant feeling of agitation and feeling of depression that he had had episodes when he lost control of himself, during which he would cry, shake generally, for no

apparent reason as far as he could tell. At least he felt that the situation didn't warrant the reaction that he would experience, and he came in hopes that we could do something about this nervousness.

"I made a diagnosis of a traumatic neurosis. I might say a traumatic neurosis is a neurosis which follows trauma. A neurosis is an emotional illness or disorder without marked loss of contact with reality in thinking and in judgment. This is in contradiction to insanity or a psychosis. It is a disturbance in emotional adaptation due to an unresolved internal conflict. I may have to explain this to you—it is usually less severe than in a psychosis and one in which the patient recognizes that his emotional feelings are not in keeping or out of proportion to the external stimulation or the thing that sets it off. Now the symptoms of a neurosis can be a number of things, one is a general symptom of nervousness and uneasiness and anxiety that we all know about and feel. In addition to that we can have feelings of depression; we can have headaches; we can have tremors of the hands, of the body; there are numerous things that we can have, but the thing that is most noticeable about this sort of neurosis that Mr. McMahon has is that the symptoms occur rather unexpectedly as far as the patient is concerned and in situations which the patient knows doesn't warrant the emotional reaction . . . that he experiences.

". . . in the case of Mr. McMahon, I found that Mr. McMahon was one of six children of a poor Catholic family in New York City. He described his mother as being a very glorious, hard-working, wonderful woman who did the very best she could with what she had had at hand. (At this point the plaintiff, Mr. McMahon, left the courtroom.) . . . he described his father as being an excessive drinker, a chronic alcoholic, who was extremely, constantly irritable, brutal, derogatory, and frequently physically abusive to the patient's mother and to the patient himself. As a youth the

patient did everything possible that he could to help support the family. He delivered newspapers, did everything he could, and all of his money he brought home to give to his mother to help her meet the family's needs. As a boy, he freely admitted to me that he had a real hot Irish temper. He would become angry at the drop of the hat and fight at the drop of the hat, but as he points out it was almost necessary to be able to do that to get along in the neighborhood in which he lived. In addition to this he was an extremely religious boy, was constantly active in church affairs, and had a rather-firm set of moral convictions, both from the religious standpoint and from a social standpoint, and all of these I think instilled in him by his mother. As he grew older he became determined he was going to get a college degree and get himself out of this situation in which he lived, and after he graduated from high school he began to attend night school. . . . It meant he worked during the daytime and went to school at night and studied thereafter, so for years he only got two or three hours of sleep at night. He had to do this on his own; his father would not help him, and his father constantly was sarcastic and derogatory toward his efforts and would constantly stand over him and tell him he was not going to make this, he couldn't make it, he didn't have the stuff to graduate from college. As a result of this, Mr. McMahon became all the more determined that he would do this. During this time his mother would try to protect him from the father and on several occasions the father would become quite abusive to the mother, and on one occasion he began striking the mother and the patient jumped up, grabbed the father and, as you know, Mr. McMahon is a big man, he grabbed his father and threw him down on the couch and held him there, begging his mother to leave the room which she finally did, but it was a situation in which he realized the strength of his own feeling toward his father, and in fact, I think it was a situa-

tion which frightened him a great deal. He was still having difficulty with his temper and he worked . . . for Metro-Goldwyn-Mayer for a while. I don't think he lost any jobs, but he realized that he had considerable difficulty on the jobs because he did have this temper, that he was constantly angry. These angry periods would last for a period of a couple of weeks before he could finally rid himself of this feeling of irritation and anger, and he decided that for his own good he'd have to do something to control this, so for a full year he worked extremely hard to control his temper and anger and he was successful. He then moved to Milwaukee, and I think this is some twenty years back, and he worked for a short time with the shows there and then became a sales representative for a liquor, wholesale liquor firm, I think, worked in a job selling liquor, etc., a situation which really calls for a great deal of emotional control and control of one's self, and for twenty years he had no difficulty whatsoever in this job and was extremely successful. He married in the meantime, he has had two children. This marital adjustment has been satisfactory and a happy one. . . . I saw him a number of times after this and the fact that he lost control at the accident was a very traumatic one to him, and the fact that he was not able to control himself thereafter or that he was likely to lose control of himself was extremely disturbing to him, 'Here I am, a great big, strong, husky man and then suddenly I find myself crying and shaking and unable to control myself,' as he told me. He came to me with real purpose in helping himself get over this.

"Now I'll admit that I didn't know when I saw this patient that there was anything involving legal action at all, but at no time in this man have I seen any indication that there was any evidence of a compensation neurosis or where one maintains his neurosis in order to get a better settlement when he reaches court, and I have seen a number of those.

Usually these people don't get well or don't get any better in therapy; they are not co-operative patients in therapy; they will not work on their particular problems. If therapy gets too tough on them, they quit. In other words they leave therapy, and Mr. McMahon has not shown anything of this nature; he has worked hard on his problem, he has gotten better, and he has not quit even though therapy has been extremely difficult for him. For example, he was taking something like 15 to 20 Milltown a day at the time I first saw him, and an average dose of Milltown is four times a day, four tablets a day, . . . up until the time that he lost his son he was down to taking two tablets of Milltown a day. He has in therapy, . . . regained his self-confidence, has been able to return to work, was able to meet several difficult situations in his job which is one in which he acts as a consultant for the various salesmen, and I think he has done very well. Now why do I feel that this man has this particular problem? In his family he developed rather naturally very aggressive and hostile and destructive feelings toward his father. He in a very real sense hated his father, but being a good, moral Catholic boy, this boy has to honor his father and love his father and there is no place for this kind of feeling in his emotional state, so he made every effort to get rid of this feeling. Now how does he do this? He really doesn't get rid of this feeling, but repressed it by conscious effort and gradually he begins to try to forget it, pushes it back to become unaware of this feeling of hostility toward his father, and unfortunately you see when one has a tremendous amount of hate toward a father he is very likely to extend this hate to other figures of authority, so on his job he'd have trouble with his boss, he'd have trouble with the policeman if the policeman ordered him around. He'd tend to react adversely to any figure of authority. He recognized this not in the sense I would or as I am explaining it to you, but only that he was having trouble on the

job because he had a temper. He made a conscious effort to control his temper and get rid of these feelings. Now for twenty years he was able to do this, had no difficulty whatsoever. Then he has this accident. *Now in a traumatic neurosis we say that there is a pre-existing emotional state or readiness for this neurosis, and it takes some precipitating event to cause the neurosis to show itself.* Now, if, as in Mr. McMahon's history, if he knows he is going into a difficult situation that's going to be hard for him, he is able to prepare himself and meet this without losing control or being upset. This is what he has done and he was able to do this for twenty years without any difficulty, even meeting situations which were unplanned. Let's take this accident in which he's knocked unconscious and in which he is confused and foggy. At this time his brain is not functioning normally, he is not able to use his repressive mechanism which he has used before and which has enabled him to be normal, to be a normal person in a very practical, livable sense, and he looks and he sees an older man lying on the ground, apparently dead, and bleeding, and a woman sixty-five years of age standing there rather helpless, confused, and no one helping her, and he falls apart. Now I feel that this situation is the kind which would precipitate this kind of a reaction, I think he immediately associated the older man lying on the ground with his father who now looks dead, and the mother or the woman with his own mother, who by the way he said is sixty-five years of age . . . this happens to be the age at which his mother died, sixty-five years of age, and he then lost his control. In other words, it is at this time when he no longer associated with these particular individuals his own parents' situation and the conflict therein is too much for him to control, he is not able to control it at that time because he doesn't have his normal mental faculties and the hysterical reaction results with the crying and shaking. Now in a sense, the cat is out of the

bag, he has this previously repressed conflict which he'd been able to repress as no longer repressed; he now has to deal with it again. Now in therapy with him—I can base my feelings about his identifying this man with his father on his reactions in therapy whenever this subject is approached; in fact, Mr. McMahon in therapy attempts to avoid this situation; whenever we get close to the father, he wants to talk about the Braves or talk about business or something of that nature because each time we come to his father, Mr. McMahon breaks down, walks about the room, cries, and smashes his fist in his hand and tells me, 'I don't hate my father, I love him, because without him I wouldn't have had the guts to get where I am now. I don't think its right for a son to hate his father.' But in the meantime here he is smashing his fists and walking around which I feel is a denial of it, and as I say, he doesn't still accept his own hostility toward his father. He has at one time in therapy suddenly burst out and said, 'I wish my father had died instead of my mother because then I could have repaid her for some of the kindnesses she did me,' but he then turned around and said, 'but understand, I respect my father.' But I must say that I do feel he is getting better because each time we do approach this situation a little bit of the emotion that is involved in this conflict is loosened and liberated and I think he is getting better because of this reason. I think that's it. . . .

"Now let's take Mr. McMahon; as far as I know from the history I have for the twenty years prior to this accident, he was functioning normally; he was normal. The trauma occurred suddenly and robbed him at that particular time of his normal defensive mechanisms which enabled him to lead a normal life and it is for that reason, I feel, this is a trauma, a neurosis induced by trauma. It is my opinion that the type

of collision the plaintiff had, as he explained it to me, was competent to produce this trauma."

On cross-examination Dr. Smith testified in part:

"I described Mr. McMahon's condition as a traumatic neurosis, but I have described it as an anxiety reaction. Plaintiff suffers an anxiety reaction which is precipitated by a trauma. It is a descriptive term more or less describing the symptoms he has. Anxiety reaction is a technical term psychiatrists use to describe the symptoms. It is my opinion that his symptoms are best described as an anxiety reaction.

"This anxiety reaction arises because Mr. McMahon has identified Mr. Bergeson, the driver of the other car, with his own father. Mr. McMahon has very strong feelings about his father. He has had these since he was a young man. Prior to the accident his feelings about his father had been pushed down and repressed. His powers of repression were weakened by the accident itself and the mental trauma that he received at that particular time. The accident weakened these powers of repression. After the powers of repression had been weakened, he then saw Mr. and Mrs. Bergeson. These people reminded him of his own father and mother. In a sense, plaintiff has the same feelings about Mr. Bergeson that he has about his own father. Mr. Bergeson only acted as a stimulus which recalled or renewed or brought forth the feelings that he had toward his father. He doesn't feel this way toward Mr. Bergeson specifically.

" 'Repression' is a mechanism or means by which we can push away highly unpleasant thoughts. After they are repressed those thoughts or impulses are still there. It is not necessarily true that those thoughts or impulses are as strong as they ever were. Experiences with other father-figures, whatever they might be, might attenuate them somewhat. Frequently they do remain pretty much of the same intensity.

I can't say for sure whether the feelings of Mr. McMahon are of the same intensity after they were repressed. I am certain they are very strong. They are still there and in a sense always trying to push up. They always want to come to the surface, be satisfied so as to speak.

"It's when plaintiff saw Mr. and Mrs. Bergeson that he fell apart. That is the point at which he identified Mr. Bergeson with his father. He didn't identify Mr. Bergeson with his father at the moment of impact.

"An anxiety is a feeling of apprehension or fear for which there isn't an external objective stimulus. It is a response to threats from repressed dangerous impulses deep within the personality. The anxiety in responding to these dangerous impulses in turn manifests itself. These symptoms we talked about are the manifestations of the anxiety. That is why we call this an anxiety reaction. It arises because these feelings are trying to push up. It is anxiety over the threatened break-through, or break into consciousness of these feelings. You sense these feelings are coming up and it worries you. These symptoms indicate to me that there are strong feelings in the unconscious.

"*Plaintiff had a neurosis before the accident, just as many of us have a neurosis.* Theoretically he had a neurosis. Probably socially and functionally he didn't have a neurosis before the accident. This was not a hidden defect. *It was a conflict which he had previously been able to keep under control, keep it repressed, and managed it successfully.* The fact that he had kept it under control for twenty years was a pretty good sign he had it well in hand. But he had it nevertheless.

"If the driver of the other car involved in this collision was a sixteen-year-old girl and Mr. McMahon had this momentary unconsciousness he told me about, and then he turned and saw the sixteen-year-old girl, it would more probably decrease the likelihood that he would have this

profound reaction. We must look at the whole accident, the fact that Mr. Bergeson was an older man, that Mrs. Bergeson was there, that Mrs. Bergeson was sixty-five years old, or appeared to be around sixty-five years old, the fact that the patient reacted to her as sixty-five. We must take all of these facts because these are the facts that reminded him of his father. If the driver of the other car was a sixteen-year-old girl and she was alone, it would be unlikely that he would have these feelings about his father. . . . The fact that Mrs. Bergeson was present was important. If Mrs. Bergeson had not been present at this accident this would tend to reduce the likelihood that Mr. McMahon would have reacted the way he did. I think the important thing is the old man being there and unconscious. If Mrs. Bergeson had not reminded Mr. McMahon of his own mother, that would reduce the likelihood he would have reacted the way he did. She is part of the picture. If Mr. Bergeson was a man of around twenty he would not have reminded Mr. McMahon of his own father. The fact that Mr. Bergeson is an older man is very important.

"*Q. In other words, doctor, it is this unique combination of accident plus an older man plus an older woman who appears to be injured, it is this combination that made Mr. McMahon react the way he did? A.* That's right. [Emphasis supplied.]

"The fact that plaintiff was unconscious, something knocked him unconscious, weakened his powers of repression. Immediately after the accident he did not have this anxiety reaction. The mere weakening of his powers of repression, that alone, makes him vulnerable. He didn't have the anxiety reaction at that point. . . . The anxiety reaction arose with the later identification. That's what I mean when I say the accident was a competent reducing cause. Mr. McMahon has regained his confidence to a large

degree. He has done very well considering his previous state. He is getting better.

"Without these very strong feelings that Mr. McMahon has about his father, there would be no anxiety reaction in this specific case. Those feelings have been associated at least with Mr. Bergeson. Those are the feelings about which Mr. McMahon is anxious. . . . There is no absolute way of saying how long this condition will continue. He is getting better."

There was no testimony offered by the defendant to controvert the medical testimony submitted on behalf of the plaintiff.

### Proper Rule of Damages.

The testimony of Dr. Smith establishes that the neurosis did not have its origin in the brain concussion, but was due to the plaintiff's having seen Bergeson immediately after the accident lying on the pavement with his wife standing alongside. This requires that the same rule of damages be applied as in the cases in which recovery is allowed for emotional distress alone. Such rule precludes recovery in an action grounded upon negligence for emotional distress which is due to a pre-existing susceptibility to emotional disturbance not present in a normal individual, unless the actor had prior knowledge of such susceptibility. Restatement, 2 Torts, p. 852, sec. 313; Prosser, Law of Torts (2d ed.), pp. 179, 180, sec. 37; McNiece, Psychic Injury and Tort Liability in New York; 24 St. John's Law Review (1949), 1, 77; Smith, Relation of Emotions to Injury and Disease: Legal Liability for Psychic Stimuli, 30 Virginia Law Review (1944), 193, 282.

There is no question that the plaintiff did suffer physical injury, and because of the possibility that there may be a new trial, we do not comment upon the plaintiff's injuries

and resulting disability. The judgment must be reversed and the cause remanded to the trial court for a new trial on damages, unless the trial court can devise a suitable option confined to the plaintiff's damages for physical injuries under which the plaintiff elects to accept the amount of such option in lieu of such new trial.

*By the Court.*—Judgment reversed, and cause remanded with directions that a new trial be had on the issue of damages only, unless the trial court can devise a suitable option confined to the plaintiff's damages for physical injuries, which option the plaintiff elects to accept in lieu of such new trial.

FAIRCHILD, J. (*dissenting*). There is evidence to support the following determinations by the jury. For the purpose of the appeal, their truth was virtually conceded: (1) Bergeson was negligent; (2) Bergeson's negligence caused the impact, and plaintiff's concussion of the brain; (3) there were stresses in plaintiff's emotional background, described by Dr. Smith; (4) the concussion made plaintiff vulnerable to an anxiety reaction; (5) the fortuitous resemblance of the Bergesons to plaintiff's parents triggered the anxiety reaction; (6) plaintiff experiences substantial suffering. On oral argument defense counsel disclaimed any intimation that plaintiff's illness is fanciful.

The majority of the court rely upon the rule which would apply if plaintiff were a bystander whose emotional peculiarities were triggered by witnessing the injury of people who chanced to resemble his parents.

It is clear that Bergeson's negligence caused plaintiff's illness. One element of causation was physical injury produced by the negligence. A concurring element was plaintiff's observation of the predicament of the injured Bergeson and his wife, a situation immediately resulting from Berge-

son's negligence. The only unforeseeable or unusual causal elements were the stresses in plaintiff's emotional background and the resemblance of the Bergesons to his parents. I do not think that these unusual elements constitute public-policy grounds for denial of recovery. See *Colla v. Mandella* (1957), 1 Wis. (2d) 594, 598, 85 N. W. (2d) 345. Far-more-serious physical injury to plaintiff would not be an extraordinary result of an identical accident.

I am authorized to state that Mr. Justice HALLOWS joins in this dissent.