**Mary PIECZYNSKI, Plaintiff–Appellee,**

v.

**Katherine DUFFY and Roberto Maldonado, Defendants–Appellants.**

No. 88–2381.

United States Court of Appeals,
Seventh Circuit.

Argued April 19, 1989.

Decided May 30, 1989.

Rehearing and Rehearing En Banc Denied
July 7, 1989.

**1332**

Mardell Nereim, Asst. Corp. Counsel, Chicago, Ill., for defendants-appellants.

John L. Gubbins, John L. Gubbins & Associates, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, POSNER, and KANNE, Circuit Judges.

POSNER, Circuit Judge.

Mary Pieczynski, an employee of the City of Chicago, brought this civil rights suit (42 U.S.C. § 1983) against the City and three of her supervisors, charging political harassment in violation of the First Amendment, which has of course been held applicable to the states and their subdivisions. The jury exonerated the City and one of the supervisors, but found the other two supervisors, Duffy and Maldonado, liable, and awarded Pieczynski $95,000 in compensatory damages and $7,500 in punitive damages. Duffy and Maldonado appeal, represented by the City. The City argues qualified immunity and also complains about the exclusion of certain evidence and about the size of the damages award, but its major argument is that there is insufficient evidence of harassment to sustain the verdict. In making this argument the City, in an ill-mannered brief bristling with ad hominem criticisms of its adversary, presents the facts as it would have liked the jury to find them rather than the facts that a rational jury might have found against the appellants.

Claims of politically motivated personnel action in public employment abound in this circuit—*Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), which opened this particular floodgate, originated here—and it may be useful at the outset to try to harmonize the precedents in order to provide guidance to the bench and bar of this circuit. Our emphasis is therefore on Supreme Court and Seventh Circuit cases, but we shall refer to a few cases from the other circuits too.

■ 1. The discharge of a public employee because of his political beliefs violates the First Amendment, *Elrod v. Burns, supra,* unless the employee's job is a policymaking position or a position of confidence, such that his employer should have a free hand in deciding whether to retain him, *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Bicanic v. McDermott,* 867 F.2d 391 (7th Cir.1989); *Kurowski v. Krajewski,* 848 F.2d 767, 769–70 (7th Cir.1988); *Soderbeck v. Burnett County,* 752 F.2d 285, 288 (7th Cir.1985).

■ 2. A discharge is not *because* of the employee's political beliefs if the employee would have been discharged regardless of those beliefs, even if the reason he would have been discharged anyway, while nonpolitical, is thoroughly disreputable, such as nepotism. *Byron v. Clay,* 867 F.2d 1049, 1051 (7th Cir.1989) (dictum); *Lindahl v. Bartolomei,* 618 F.Supp. 981, 990–91 (N.D.Ind.1985). The First Amendment is not a civil service statute.

■ 3. A discharge does not violate the First Amendment even though the only reason for the discharge is political, if reinstatement or the other relief requested would violate strong public policy, for example as embodied in state criminal prohibitions of "ghost employment" (which means being on the public payroll without doing any work). *Byron v. Clay, supra,* 867 F.2d at 1051–52. To that extent—but to that extent only—there is a defense of "unclean hands" (if equitable relief is sought) or *"in pari delicto"* (if legal relief is sought). But the mere fact that valid grounds exist for discharging the worker will not excuse the employer if, had it not been for the worker's political beliefs, he would not have been discharged. See *id.* at 1051; *Shondel v. McDermott,* 775 F.2d 859, 869 (7th Cir.1985).

■ 4. Harassment of a public employee for his political beliefs violates the First Amendment unless the harassment is so trivial that a person of ordinary firmness would not be deterred from holding or expressing those beliefs. See, e.g., *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982);

*Rode v. Dellarciprete,* 845 F.2d 1195, 1205 (3d Cir.1988). The harassment need not be so severe as to amount to constructive discharge—that is, it need not force the employee to quit, by making work unbearable for him. *Lieberman v. Reisman,* 857 F.2d 896, 900 (2d Cir.1988); contra, *Delong v. United States,* 621 F.2d 618 (4th Cir.1980).

■ 5. A statute or ordinance, general in terms, governing public employment does not violate the First Amendment even if enacted in retaliation against a group of public employees for their political views or activities. *Fraternal Order of Police v. City of Hobart,* 864 F.2d 551 (7th Cir.1988); cf. *Rateree v. Rockett,* 852 F.2d 946, 950–51 (7th Cir.1988).

■ 6. Political criteria are permissible in hiring, although not in firing. *Rutan v. Republican Party of Illinois,* 868 F.2d 943, 954–55 (7th Cir.1989) (en banc); cf. *LaFalce v. Houston,* 712 F.2d 292 (7th Cir.1983) (permitting the use of political criteria in awarding public contracts). The principle has been extended to transfers following the abolition of particular jobs— as a practical matter such transfers are hires. See *McDonald v. Krajewski,* 874 F.2d 454, 455 (7th Cir. 1989).

■ 7. Political criteria are also permissible in promotions and in transfers between existing jobs unless the practical consequence for an employee adversely affected by the application of the criteria is to discharge him. *Rutan v. Republican Party of Illinois, supra,* 868 F.2d at 955– 56; contra, *Bennis v. Gable,* 823 F.2d 723, 731–32 (3d Cir.1987). This use of politics is thus treated differently from harassment targeted on particular employees (*Bart v. Telford, supra* ). "[A]cts of retaliation must be distinguished from favored treatment of political supporters that has the incidental effect of making a nonsupporter no better off." *Rutan v. Republican Party of Illinois, supra,* 868 F.2d at 954 n. 4. It is one thing to be a target of a campaign of retaliation, another to be incidentally disfavored as an inevitable but not intended

consequence of favoritism for other employees.

Do the decisions establishing as the law of this circuit the propositions we have set forth compose a pattern, or a crazy quilt? We discern a pattern, albeit of the rough-and-ready sort characteristic of common law adjudication. The courts, interpreting a vague constitutional command in circumstances remote from those envisaged by the framers, feel the tug of opposing policies. See, e.g., *LaFalce v. Houston, supra; Horn v. Kean*, 796 F.2d 668 (3d Cir. 1986) (en banc). On the one hand, retaliating against public employees for their political beliefs may strip a significant (although not, characteristically, an outspoken) part of the community, namely rank-and-file civil servants, of freedom of political expression. The broader public will be losers as well, to the extent that public employees have valuable insights and information about the operation of government to convey. (Yet the constitutionality of the Hatch Act, which forbids federal employees to take an active role in political campaigns, has been upheld against a First Amendment challenge. See *United States Civil Service Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).) On the other hand, the First Amendment can hardly be thought to command a thorough purging of politics from politics and the reconstruction of all of American government on the city-manager model. Such a program would be as quixotic as it would be undemocratic, and in preventing government officials from rewarding loyal supporters with government jobs or government contracts could diminish rather than intensify the energy of political debate.

The balance that has been struck confines constitutional protection to public employees who do not occupy a position of confidence or of responsibility for making policy, and who either lose their jobs or are made targets of on-the-job harassment in retaliation for failing to support the incumbent, and who neither are "ghost workers" nor would have been fired or disciplined on any (other) nonpolitical ground, so that their only offense is their politics. This fairly narrow class of protected employees presents the most sympathetic case for judicial intervention, because the affront to First Amendment values is patent, while the interest in loyal and effective government is minimally impaired by judicial intervention in such a case. The balance is different when a newly elected official seeks to fill jobs with the people who made his victory possible or wants confidential employees whom he trusts and policymaking employees who share his policy views.

Yet even the case we have described as the strongest for judicial intervention is problematic, for reasons related to judicial capacity to find facts and well illustrated by the present case. "Harassment" that is divorced (as here) from any racial or sexual overtones is exceedingly difficult to distinguish in practice from the normal friction between supervisory and subordinate employees; as a result, the existence of a constitutional tort of political harassment places public employers at the mercy of the vagaries of juries. Employees may try to buy themselves immunity from discipline by staking out a political position opposed to that of their employer, then ascribing to political persecution every act of discipline, every adverse change in working conditions, every failure of consideration by a superior, and finally bringing a suit for compensatory damages based on vague emotional malaise, and seeking punitive damages to boot.

It would be nice to be able to filter out the phony cases but we have been unable to think of a good filter beyond what is already provided by pretrial discovery and summary judgment and Rule 11 and directed verdict and remittitur and the other checks on groundless cases and runaway juries. In the end much will depend on the good sense of juries, and our faith in the jury is not so great that we can regard this prospect with equanimity.

■ The present case is exceedingly thin and the plaintiff may owe her victory largely to the heavy-handed tactics of the City's lawyer, who in closing argument repeated-

ly called Mrs. Pieczynski a liar and challenged the jury to award her a million dollars if it disagreed. "He [the plaintiff's counsel] is asking for $100,000. You might as well give her a million dollars. If you believe that, give her all the money in the world." Poor representation of state and local government is an old story.

Mary Pieczynski had been hired in 1980 as a secretary to Edward Scanlon, Director of Management Services in the Mayor's Office of Employment and Training, at a salary of $10,600. Both she and Scanlon were members of the 10th Ward Democratic Organization, headed at the time by Alderman Edward Vrdolyak; she owed her job with Scanlon to this political connection. In 1983 Pieczynski was promoted to an executive position in the office, at a salary of $18,000 which by the time of trial had risen to $25,000. Shortly afterward, Harold Washington—a bitter enemy of Vrdolyak—was elected Mayor, and eventually Scanlon left and was replaced on an acting basis by Pieczynski. In November 1984 defendant Maldonado was appointed the permanent successor to Scanlon. Maldonado reported to defendant Duffy, the recently appointed Deputy Director of the Mayor's Office of Employment and Training. Both Duffy and Maldonado were supporters of Mayor Washington, and there was much bad blood at the time between Washington and Vrdolyak, who were fighting for control of the City Council. There was evidence from which a reasonable jury could infer that both Duffy and Maldonado knew of the plaintiff's connection with Vrdolyak, for she and her husband were heavily involved in public activities on Vrdolyak's behalf.

Two months after Duffy's appointment (and one month after Maldonado's), Duffy wrote a memo to the City's Department of Personnel requesting that disciplinary action be taken against Mrs. Pieczynski for a number of alleged misdeeds, such as using an unauthorized parking place. The jury was entitled to find that these accusations were baseless; and in fact no disciplinary action was taken against her. Then Maldonado took up the cudgels, accusing Pieczynski of taking a bribe by accepting a gift of a cordless telephone from a city contractor, confining her duties to monotonous paper work, terminating her supervisory authority over other employees, removing her long-distance line (so that she had to borrow another employee's phone when she had a long-distance call to make, as her work required her often to do), calling her a liar, denying requests for vacation time and administrative leave, abusing her for leaving work early one day to pick up an ill child, failing to introduce her to new employees, turning down her repeated requests to change her lunch hour, and failing to invite her to his birthday party. To all these accusations (the last of which, at least, is absurd, for the party took place after this suit was filed, and the First Amendment does not require the defendant in a lawsuit to invite the plaintiff to his birthday party) the defendants presented reasoned defenses, emphasizing for example that after Maldonado replaced Pieczynski *of course* her supervisory duties were curtailed. And the plaintiff's counsel soared into outer space in closing argument, arguing that Maldonado, a psychology major in college, had learned in Psychology 101 "how to drive mice nuts" and had used his learning to torment Mrs. Pieczynski.

But we cannot quite say that no rational jury would have believed Mrs. Pieczynski's version of the facts. For example, while the defendants presented evidence that her long-distance phone line was one of five or six removed as an economy measure, she rebutted with evidence that when later 40 new long-distance lines were installed she wasn't given one even though she needed it for her work. Taking the facts as favorably to her case as reason permits, we cannot say that she was not the victim of a calculated campaign to humiliate her, drive her to resign, even break her health, in punishment for her association with the hated Vrdolyak. And such a campaign violates the First Amendment.

The other issues can be dealt with very briefly. *Bart v. Telford, supra,* scotches the defendants' defense of qualified immunity. Decided before the election of Mayor

Washington, *Bart* holds that a campaign of petty harassments directed against a public employee in retaliation for his political beliefs or affiliations violates the First Amendment. The facts were different from those of this case—one of the alleged acts of retaliation directed against Miss Bart was making fun of her for bringing a birthday cake to an office party, and there is a birthday party but no cake in this case. But the principle that a campaign of petty harassments can violate the First Amendment (unless *de minimis*) was clearly stated in *Bart,* and should have placed these defendants on notice that false accusations and petty humiliations, if orchestrated into a campaign of political retaliation, are actionable. See *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Kurowski v. Krajewski, supra,* 848 F.2d at 773.

■ The judge excluded evidence that the defendants disciplined and otherwise took adverse action against persons under their supervision who were supporters of Mayor Washington and promoted or otherwise treated favorably several opponents of Washington. Of course such evidence must be let in if the plaintiff has been allowed to present evidence to show a pattern of discrimination. Cf. *Miller v. Poretsky,* 595 F.2d 780, 784–85 (D.C.Cir.1978). But if the plaintiff presents no such evidence the trial judge has a broad discretion to exclude the defendant's proffer, a discretion that was not abused here. Just as it is not a defense to racial discrimination in employment that the employer mistreated some of his white employees and didn't mistreat all of his black employees, so it is not a defense to a claim of political retaliation in employment that not *all* personnel decisions by the employer were politically motivated. It might be quite feasible to intimidate an entire office by picking on one employee, and this strategy should not buy a form of legal immunity. The evidence that the City wanted to put in was not entirely devoid of probative value, especially the evidence that the defendants had promoted known Vrdolyak supporters. But allowing the evidence in would have extended the trial indefinitely since the parties would have wanted to delve into the circumstances surrounding each personnel action. This is just the sort of situation in which trial judges must exercise an informed judgment under Fed.R.Evid. 403, a judgment that in this age of extraordinarily heavy judicial caseloads we will rarely be disposed to disturb. Cf. *McCluney v. Jos. Schlitz Brewing Co.,* 728 F.2d 924, 929 (7th Cir.1984).

■ The compensatory damages were heavy, considering that Mrs. Pieczynski retained her job, salary, benefits, etc. in the face of the alleged campaign of harassment. Nevertheless Mrs. Pieczynski's doctor and priest as well as members of her family testified that she experienced severe emotional distress which aggravated an existing back condition and caused other physical suffering, extending over a period of years. Although as the City points out the damages awarded were greater than in other political harassment cases in this circuit, the other cases did not involve the same degree of emotional and physical distress. We cannot say that the damages awarded were *so* excessive—so "monstrously excessive," as the cases like to say—in the circumstances that the district judge was required to set the award aside. See *Cygnar v. City of Chicago,* 865 F.2d 827, 847–48 (7th Cir.1989); *Abernathy v. Superior Hardwoods, Inc.,* 704 F.2d 963, 971 (7th Cir.1983). The tortfeasor takes his victim as he finds him (in this case her), so if the victim has a preexisting condition which the tort aggravates, the tortfeasor is liable for the full consequences. *Williamson v. Handy Button Machine Co.,* 817 F.2d 1290, 1294 (7th Cir.1987); *Lancaster v. Norfolk & Western Ry.,* 773 F.2d 807, 820 (7th Cir.1985); *Parrett v. City of Connersville,* 737 F.2d 690, 694–95 (7th Cir. 1984); *Stoleson v. United States,* 708 F.2d 1217, 1220–21 (7th Cir.1983). The punitive damages were modest, assuming as we must that the defendants really did subject the plaintiff to a deliberate campaign of harassment perilous to her health, and did so for no better reason than that she sup-

ported an adversary of their political leader.

AFFIRMED.