# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-2501

KATHLEEN LIFTON,

*Plaintiff-Appellant,*

v.

THE BOARD OF EDUCATION OF THE
CITY OF CHICAGO, ARNE DUNCAN,
and WILLIAM MEUER,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 03 C 0743—**Elaine E. Bucklo**, *Judge.*

———————

ARGUED JANUARY 21, 2005—DECIDED JULY 22, 2005

———————

Before RIPPLE, WOOD, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Kathleen Lifton was an award-winning kindergarten teacher who taught at Norwood Park Elementary School, a Chicago public school on the city's northwest side. In January 2003, however, she resigned, claiming she had been retaliated against for her opposition to the early renewal of her school principal's contract and for her proposal to change the school's kindergarten program. She sued the Chicago Board of Education, its chief execu-

tive, and the school principal, asserting a violation of her First Amendment rights, as well as claims for denial of due process, defamation, and intentional infliction of emotional distress. The district court granted summary judgment to the defendants and we affirm.

## I. Background

By all accounts Kathleen Lifton had been an exemplary teacher during her fifteen-year stint as a kindergarten teacher at Norwood Park. In 2002, however, things changed. In June of that year, she decided that the kindergarten program at Norwood Park could use some adjustments, and she brought her suggestions to the attention of the school's principal, Dr. William Meuer. Lifton proposed modifying the school schedule so that students would have staggered dismissal times. She also proposed rearranging her teaching schedule to focus on academic subjects in the morning, when she believed students were better able to concentrate. She wanted to teach from 9 a.m. to 2 p.m. without a break, working through lunch with half the kindergartners while the other half ate lunch with a teacher's aide. The remainder of the kindergartners' school day would be staffed by the teacher's aide and parent volunteers. Meuer responded that they could discuss her proposal in the future but that it was too late to change the program for the upcoming school year with only two months' notice.

In addition to her teaching duties, Lifton was a teacher representative on Norwood Park's Local School Council ("LSC"), a group comprised of parents, teachers, administrators, and community members charged with certain planning and oversight responsibilities at the school, in addition to authority over the spending of certain discretionary funds. On June 11, 2002, shortly after talking to Meuer about her proposal for restructuring the kindergarten program, Lifton sent a flyer home to parents inviting them

to an upcoming LSC meeting on June 13. The flyer read, in pertinent part: "It's not working . . . but we can fix it! Be part of history in the making. Take a sneak peak [sic] at next year's kindergarten program. . . . Regretfully babysitting will not be provided."

This flyer troubled Meuer for two reasons. First, and most importantly, he had just told Lifton that it was too late to change the kindergarten program with only two months' notice, yet she decided to take her plan to parents anyway. His second objection concerned Lifton's cancellation of babysitting service, which was customarily provided for LSC and PTA meetings at the school. Lifton had told Meuer in early June that she did not want her classroom used for babysitting because it had been "trashed" during a recent PTA meeting; Meuer said he would look into it and offered to relocate the service. But Lifton had no business cancelling the babysitting service.

Lifton's unauthorized flyer about the LSC meeting was followed by an even more unusual communication she sent to parents two weeks later. On June 25 Lifton sent a letter to parents with the following message: "Yesterday, I cried and slept and slept and cried, unmotivated to complete your child's report card as I had planned . . . . You know your child best. Please complete the final quarter of the report card. How does it feel to you?" The letter then asked for parental input on her kindergarten restructuring plan, again stating, "[l]et's just call it history in the making." Meuer learned about this letter when an angry parent came to his office demanding an explanation, and other parents called the school district's regional office to complain. Meuer initiated a review of Lifton's actions, but because school was out for the summer, he could not conduct a disciplinary hearing until August 28, the first day of the 2002-2003 year.

In the meantime, soon after school recessed for the summer, Lifton went to Mexico on a vacation with her sister.

However, she had not completed required year-end tasks such as turning in her attendance records, lesson plan books, and room keys, and cleaning out her classroom. When she returned from vacation, Lifton attended an LSC meeting on July 11, where she learned that the first item on the council's agenda was the renewal of Meuer's contract. Lifton previously had expressed her view that Meuer's contract should not be renewed by the LSC during the summer, preferring that the committee address the matter in the fall. In her opinion renewal of Meuer's contract was not a rush and other issues should be given priority. Accordingly, at the July 11 meeting, Lifton moved to form a "vision committee" to evaluate Meuer and consider adding terms to his contract; this motion was adopted. Lifton's kindergarten proposal was also raised at the July 11 meeting, and Meuer and Lifton met a few days later to discuss it again.

Later in July, Lifton sent a third letter home—addressed "Dear Kindergarten Friend" and sent to her students—in which she described her trip to Mexico. Among other things, she told the children that "a bird pooped" in her lap at a restaurant and that her sister "got in big trouble for taking things that don't belong to her." This letter also troubled Meuer; he had not seen it in advance and questioned whether the content of the letter was appropriate for a letter from a teacher.

Meuer met with Lifton and her union representative on August 28, 2002. The meeting lasted more than an hour, although they did not finish their business that day and no discipline was ever initiated by Meuer. The same day, however, in separate proceedings, the Chicago Board of Education issued a "warning resolution" to Lifton, recommending a fifteen-day suspension. The warning resolution cited twelve deficiencies in Lifton's performance, mostly relating to the sending of unauthorized and inappropriate letters home, as well as her failure to grade student report

cards and finish year-end duties. The warning resolution was recommended by defendant Arne Duncan, the chief executive of the Chicago Public Schools. Duncan testified in an affidavit that he had no knowledge about the predisciplinary meeting at the school between Lifton and Meuer, nor did he know that Lifton had opposed the early renewal of Meuer's contract.

Lifton kept teaching for approximately two weeks after the warning resolution was issued. On September 12 she attended parents' night at the school; the assistant principal was in her classroom observing her interaction with parents. That same night the LSC held a meeting at which Lifton told council members that she was the victim of a "witch hunt" because she had not supported Meuer's early contract renewal. Lifton taught her class the next day (a Friday), but thereafter did not return to school, first taking a personal day and then nine consecutive sick days. After the fifth sick day, the assistant principal asked for a doctor's note, a request Lifton found upsetting. Lifton eventually went on medical leave through January 30, 2003, when she resigned. She never served a suspension.

## II.  Discussion

Lifton contends that her discipline was retaliation for First Amendment-protected speech, namely, her proposed changes to the kindergarten program and her opposition to Meuer's early contract renewal. She also claims that she was denied due process of law, defamed, and subjected to intentional infliction of emotional distress. Our review of the district court's grant of summary judgment is de novo. *Russell v. Harms*, 397 F.3d 458, 462 (7th Cir. 2005).

### A.  Retaliation Claim

A three-step analysis applies to Lifton's retaliation claim:

(1) was her speech constitutionally protected; (2) if so, was the defendants' action against her motivated by her constitutionally protected speech; and (3) if she can show that her constitutionally protected speech was a substantial or motivating factor in the defendants' action against her, can the defendants show that they would have taken the same action in the absence of her exercise of her First Amendment rights? *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002). The first two inquiries make up a plaintiff's prima facie retaliation case, and the third allows an employer to rebut that case by showing that it would have taken the adverse employment action regardless of the plaintiff's protected speech. If the employer carries its burden in the third step of the analysis, then the burden shifts back to the plaintiff to show that the proffered reasons for the employment action were pretextual. *Id.*

The parties agree that Lifton has satisfied the first prong—that her speech regarding the early renewal of Meuer's contract and restructuring Norwood Park's kindergarten program was constitutionally protected.[1] Turning then to the second factor in the analysis, Lifton must come forward with some evidence to show that her constitutionally protected speech was a substantial or motivating factor behind the disciplinary action taken against her. It is not enough to rely on the mere fact that the discipline chronologically followed the protected activity. *Smith v. Dunn*, 368 F.3d 705, 708 (7th Cir. 2004); *see also Wright v. Ill. Dep't of*

---

[1] That is to say, the defendants have conceded that the speech touched on matters of public concern, and they do not argue that the school's interest in promoting efficient and effective public service outweighs Lifton's interest in speaking. *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will County, Ill.*, 391 U.S. 563, 568 (1968); *Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002).

*Children & Family Servs.*, 40 F.3d 1492, 1500-01 (7th Cir. 1994) (courts generally cannot "draw strong conclusions from the mere fact that protected speech may have preceded an adverse employment decision"). The typical retaliation case involves a whistleblower or disgruntled employee who threatens the status quo in such a way that a supervisor might logically want to silence the whistleblower's voice. *See*, *e.g.*, *Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 936 (7th Cir. 2004) (posting fliers criticizing public works superintendent for delayed response to hazardous material spill); *Ceballos v. Garcetti*, 361 F.3d 1168, 1176 (9th Cir. 2004) (disclosing misrepresentations in sheriff's deputy's warrant application); *Martinez v. Tex. Dep't of Criminal Justice*, 300 F.3d 567, 570 (5th Cir. 2002) (reporting a prison beating); *Gonzales v. Dallas County*, 249 F.3d 406, 407 (5th Cir. 2001) (testifying about bribes); *Barker v. City of Del City*, 215 F.3d 1134, 1139 (10th Cir. 2000) (criticizing city council for violations of the law); *Vasbinder v. Scott*, 976 F.2d 118, 119-20 (2d Cir. 1992) (alerting law enforcement to potential embezzlement).

The central retaliatory action Lifton complains about is the warning resolution issued on August 28, 2002, by the Chicago Board of Education. That resolution cited her for sending unauthorized and inappropriate correspondence to parents and students; failing to grade report cards, instead telling parents to grade their own children; and failing to complete other year-end tasks.[2] To meet the second prong of her prima facie case, Lifton must show that this warning resolution was motivated by her speech about either

---

[2] There is some dispute whether Lifton knew about the school's policy that required letters to parents be cleared with the principal in advance. The relevant issue, however, is the defendants' motivation, not what Lifton knew, and she does not argue that the Board was not entitled to enforce the policy.

Meuer's contract or her kindergarten proposals.[3]

As to the first of these categories of protected speech, Lifton has presented no evidence connecting the Board's warning resolution to the views Lifton expressed about Meuer's early contract renewal. We note as an initial matter that Lifton did not actually oppose the renewal of Meuer's contract; she proposed, rather, that the LSC postpone consideration of the issue until later in the year, after an evaluation by a "vision committee" could be conducted. That fact dilutes the notion that Lifton's speech about Meuer's contract motivated the Board's disciplinary action. More important, however, is Lifton's inability to point to any evidence linking her speech on the contract renewal issue to the warning resolution issued by the Board. Duncan, the district executive who recommended that the Board issue the warning resolution, had no knowledge of Lifton's expressed views on the early renewal of Meuer's contract, a fact that Lifton has conceded. *See Carreon v. Ill. Dep't of Human Servs.*, 395 F.3d 786, 792 (7th Cir. 2005) (although union advocacy might qualify as protected speech, "there is no evidence that any of the individual defendants knew of her union involvement").

---

[3] Lifton never served a suspension and therefore never suffered any tangible harm—loss of pay or benefits, for example—as a result of the warning resolution. We recognize that "courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000). But because "the injury alleged . . . need not be great in order to be actionable," *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982), we proceed by assuming without deciding that the warning resolution's recommendation of a fifteen-day suspension, even though it was not actually served, could constitute a sufficiently adverse employment action so as to give rise to a retaliation claim. *See Spiegla v. Hull*, 371 F.3d 928, 941 (7th Cir. 2004).

The remainder of Lifton's retaliation case focuses on her speech advocating restructuring the kindergarten program, and she claims to have direct evidence of Meuer's desire to punish her for the ideas she expressed. Meuer took notes of the meetings at which Lifton's proposals were discussed. One note reads: "I meet with Mrs. Lifton to get the details prior to the LSC meeting. There are points of disagreement." Another reads: "The LSC meeting is rather heated. At the conclusion of the meeting I went to Mrs. Lifton and shared that we must meet on Monday, July 15th." Lifton argues that these notes demonstrate that her speech about the kindergarten program was the motivating factor behind the warning resolution.

To the contrary, however, when read in more complete context, Meuer's notes do not bear out Lifton's claim of retaliatory motivation related to her speech in favor of kindergarten restructuring. Rather, the notes in their totality reflect concern about Lifton's repeated sending of unauthorized and inappropriate communications to parents and students, prompted in part by the negative reactions of parents:

> 6/25/02 Communication from Mrs. Lifton is enclosed in each students' [sic] report card. Parents are in my office, phone calls are received.

> 6/25/02 P.M. I meet with Mrs. Lifton and share my frustration and the concern parents and others have expressed.

> 6/27/02 I receive another communication from Mrs. Lifton.

> . . . .

> 7/17/02 I am made aware that Mrs. Lifton has sent another letter to the children in her class. Questions of concern from some parents are expressed. Concern is focused on the language. <u>This is most concerning as I had told Mrs. Lifton on the 16th not to sen[d] another</u>

letter to parents. Could we drop it?!!!

In any event, nothing in Meuer's notes provides the required link between Lifton's proposal to change the kindergarten program and the Board's disciplinary action against her. The notes reflect that Meuer (and perhaps others) disagreed in whole or in part with Lifton's ideas for revamping kindergarten at Norwood Park, but there is no evidence connecting that disagreement to the warning resolution issued by the Board. The only evidence even arguably close is the fact that the warning resolution was premised in part on the unauthorized June 11 flyer, which invited parents to the LSC meeting for a "sneak peak [sic] at next year's kindergarten program." But it was the unilateral and unauthorized nature of the flyer that prompted the discipline, not the fact that Lifton was speaking out about restructuring the kindergarten program; there is no evidence to suggest that Lifton was being punished for communicating her ideas about changing the school's kindergarten program.[4] The flyer merely announced the meeting and invited attendance; it did not contain the substance of Lifton's proposals. Without any evidence tending to show that her speech proposing changes to the kindergarten program was a motivating factor behind the warning resolution issued by the Board, Lifton cannot establish her prima facie case of retaliation.

Lifton's case also fails the third step in the analysis (assuming there was evidence of retaliatory motive); she has not produced evidence that the Board's stated reasons for the warning resolution were pretextual. *Vukadinovich*, 278

---

[4] In its entirety the flyer read: "It's not working . . . But we can fix it! Be a part of history in the making. Take a sneak peak [sic] at next year's kindergarten program. Thursday, June 13, 2002. 6:00 P.M. School library. Regretfully babysitting will not be provided."

F.3d at 699. The burden is first on the defendants to show a legitimate justification for Lifton's discipline—that is, that she would have received the warning resolution regardless of her protected speech. If the defendants carry that burden, then Lifton must show that the defendants' proffered reasons for disciplining her were a pretext for retaliation against her protected speech. *Id.*

As we have noted, the warning resolution issued by the Board cited Lifton for unauthorized and inappropriate communications to parents and students and failure to grade her students' report cards and complete certain other year-end duties. Lifton does not argue that these reasons were illegitimate or false. Lifton suggests that the fifteen-day recommended suspension was harsher than other punishments generally handed down by the Board. Even assuming this to be true, it does not follow that the reasons cited by the Board were pretextual. Lifton gave her superiors several ample and legitimate reasons to discipline her. To accept Lifton's argument would be to substitute our judgment about the appropriate level of discipline for that of the Board and its chief executive; absent some evidence of retaliatory motivation for the discipline imposed, it is improper for us to second-guess this sort of employment decision. *See Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 683 (7th Cir. 2001) (federal courts are not to act as "super-personnel boards"). The district court properly granted summary judgment for the defendants on Lifton's retaliation claim.

## B. Due Process

Lifton also claims she was deprived of a protected property interest without due process because her predisciplinary meeting with Meuer was a "sham." As we have noted, however, Lifton never served the suspension recommended by the Board, nor did she forfeit any pay or benefits to which she otherwise would have been entitled. An unserved

suspension with no pecuniary consequences does not give rise to a due process claim. *Deen v. Darosa*, No. 04-2072, 2005 WL 1593372 (C.D. Ill. July 8, 2005); *Luellen v. City of East Chicago*, 350 F.3d 604, 613-14 (7th Cir. 2003); *Townsend v. Vallas*, 256 F.3d 661, 676 (7th Cir. 2001); *Swick v. City of Chicago*, 11 F.3d 85, 86 (7th Cir. 1993).

Lifton argues in the alternative that she was constructively discharged and that this "discharge" constitutes a deprivation of a property interest without due process. Constructive discharge occurs when an employee resigns because working conditions are so intolerable that a reasonable employee would feel compelled to quit. *Hunt v. City of Markham*, 219 F.3d 649, 655 (7th Cir. 2000). The doctrine of constructive discharge is limited to egregious cases, such as, for example, where an employee is subjected to threats or repeated racist taunting. *Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2002).

Lifton's complaints do not come close to describing a workplace so intolerable that a reasonable person would feel compelled to quit. For example, Lifton characterizes the infractions underlying the warning resolution as "petty"—proof, she says, that the defendants were "grasping at anything to pin on" her. She complains about being "monitored" by the assistant principal during the September 12 parents' night at the school. She asserts that the LSC chairman was rude to her during a meeting and that Meuer "allowed" this to happen.[5] Lifton also contends that the demand for a doctor's note after five consecutive sick days

---

[5] Lifton complains that at the LSC meeting in question, the LSC chairman rolled his eyes, made sarcastic comments, and interrupted Lifton while she was speaking. Never mind the trivial nature of this conduct, it is not at all linked to any of the defendants except under the fanciful theory that Meuer "allowed" such insufferable things to happen.

was unreasonable. She alleges that Meuer "harassed" a parent who supported her, although she does not describe the alleged "harassment." She complains that Meuer directed a custodian to discard her "things, including personal things, supplies, and educational materials," and that the custodian instead hid them in a closet; she does not elaborate on the timing or circumstances of the principal's directive to the custodian. These are trifling hardships and undifferentiated allegations of "harassment" that do not support a case for constructive discharge. Summary judgment dismissing Lifton's due process claim was appropriate.

## C. Defamation

Lifton also claims that Meuer defamed her when he told the assistant principal and a parent that she was "lazy," "burnt out," "looking for sympathy," "unstable," "resting on her laurels," and "doesn't want to work." Lifton claims these statements were defamatory *per se* under Illinois law, which recognizes a *per se* cause of action for defamation when the defamatory statements are so serious that reputational injury may be presumed. Defamation *per se* claims include falsely accusing someone of committing a crime, falsely accusing someone of having a "loathsome communicable disease," or, as is pertinent to Lifton's case, falsely imputing an inability to perform or want of integrity in the duties of office, employment, or profession. *Van Horne v. Muller*, 705 N.E.2d 898, 903 (Ill. 1998).

Vague, unprovable statements and statements of opinion do not give rise to a defamation claim, however; Illinois law requires that the allegedly defamatory statement must contain an objectively verifiable factual assertion. *Wynne v. Loyola Univ.*, 741 N.E.2d 669, 676 (Ill. App. Ct. 2000). The district court concluded that Meuer's comments do not meet this requirement, and a case Lifton cites proves the point. In *Schivarelli v. CBS, Inc.*, the Illinois Supreme Court noted

that calling someone a "crook" or "incompetent" had been held nonactionable because such bare statements contain no verifiable factual information. 776 N.E.2d 693, 698 (Ill. App. Ct. 2002) (citing *Dubinsky v. United Airlines Master Executive Council*, 708 N.E.2d 441 (Ill. App. Ct. 1999), and *Hopewell v. Vitullo*, 701 N.E.2d 99 (Ill. App. Ct. 1998)). Similarly, the court held, the assertion that the plaintiff in *Schivarelli* was "cheating the city" was not actionable, without more, because the speaker "did not explain the evidence that she was referring to, nor did she state why she thought [the plaintiff] was cheating the city, how he was cheating the city, or even what she meant by the term 'cheating.'" *Schivarelli*, 776 N.E.2d at 698.

We agree with the district court's conclusion that Meuer's offhand statements were nonactionable statements of opinion that do not contain objectively verifiable factual assertions. Summary judgment on Lifton's defamation claim was properly granted.

### D. Intentional Infliction of Emotional Distress

Lifton's final claim is for intentional infliction of emotional distress premised upon the issuance of the warning resolution and the other alleged "harassment" described above. To state a claim for intentional infliction of emotional distress, a plaintiff must show that: "(1) defendants' conduct was extreme and outrageous; (2) defendants either intended to inflict severe emotional distress or knew that there was a high probability that their conduct would do so; and (3) the defendants' conduct actually caused severe emotional distress." *Thomas v. Fuerst*, 803 N.E.2d 619, 625 (Ill. App. Ct. 2004). "Severe emotional distress" is distress so severe that no reasonable person could be expected to endure it. *Id.*

Our evaluation of Lifton's emotional distress claim parallels our analysis of her constructive discharge claim.

Asking whether Lifton's working conditions were intolerable and beyond that which a reasonable person could be expected to endure is basically the same as asking whether the emotional distress allegedly inflicted upon her was beyond that which a reasonable person could be expected to endure. Lifton's emotional distress claim fails for the same deficiencies that were fatal to her constructive discharge claim. In addition, the defendants' conduct cannot reasonably be characterized as extreme and outrageous— "so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 83 (Ill. 2003). Summary judgment dismissing Lifton's claim for intentional infliction of emotional distress was properly granted.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

A true Copy:

       Teste:

                          _____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

USCA-02-C-0072—7-22-05