In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 03-4074, 03-4120

LILLIAN L. MOSELY,

*Plaintiff-Appellant,*

v.

BOARD OF EDUCATION OF THE CITY OF CHICAGO,

*Defendant-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 03-CV-4914, 03-CV-4915—**Suzanne B. Conlon,
Matthew F. Kennelly**, *Judges.*

ARGUED APRIL 8, 2005—DECIDED JANUARY 4, 2006

Before FLAUM, *Chief Judge,* and BAUER and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* For the better part of two years, Lillian Mosely fought the efforts of the Chicago Public Schools to place her son Melvin in a special education class. She was not satisfied with the treatment Melvin was receiving; moreover, as she saw matters, her efforts led the Board of Education of the City of Chicago to retaliate against her in a number of ways. Mosely eventually sued under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.,* complaining about Melvin's treatment and the procedures the schools had used, and under 42 U.S.C. § 1983, asserting that her own

civil rights had been violated through the Board's retaliatory acts. The respective district court judges to whom these two cases were assigned each dismissed them: the IDEA case on grounds of lack of exhaustion of administrative remedies, and the retaliation case for failure to state a claim on which relief could be granted. Mosely has appealed. With the able assistance of *amicus curiae* recruited by this court to explore the issues Mosely presented *pro se* in the district court, we have concluded that these dismissals were premature. We therefore remand both cases to the district court for further proceedings.

# I

Given the procedural posture of the case, we present the facts in the light most favorable to Mosely. Our review of the legal issues presented is, of course, *de novo*.

In March 2000, Mosely learned that Melvin—at that time a student at Samuel Gompers Elementary School, one of the Chicago public schools—had been placed in a class of children with "explosive personalities." No one had notified Mosely that Melvin was subject to such a placement, despite the fact that the IDEA spells out a number of procedures that must be followed before this kind of step is taken. See 20 U.S.C. § 1414(a)(1)(A)-(B). In the course of investigating Melvin's placement at Gompers, Mosely learned that her son had also been taught by special education teachers in his kindergarten, first-grade, and second-grade years at Jesse Owens Academy.

Mosely undertook to educate herself about the procedures that the Chicago Public Schools were obliged to follow before placing a child in a special education class (or removing the child from such a class). She attended meetings of the Board, she spoke with individuals in the school administration, and she discovered and reviewed skills survey tests that Melvin had taken at Jesse Owens. Be-

cause of these efforts, she believes, at the beginning of the new school year in September 2000 school staff began to harass Melvin. On September 25, 2000, he was written up for exhibiting hostile actions. On September 28, one day after Mosely attended a Board meeting where she inquired about allocations of school funds, she received an interim progress report indicating that Melvin was failing every class except Spanish and gym. In October, a day after Mosely asked for a copy of the school budget, Melvin was "written up for a suspension hearing." The same thing happened a month later: on November 10, Mosely went to the school to pick up a memorandum, and Melvin was written up for another suspension hearing the same day. Gompers administrators never offered to assist Melvin by placing him in their program to decrease student suspensions.

In January 2001, the school placed Melvin in a sixth-grade classroom for gifted students. The teacher told him that she "did not want to get involved [in] his mother's mess with the principal." Troubles resumed in March. On March 13, police officers arrived at the classroom and pulled Melvin out for questioning because a parent had filled out a police report about a fight involving her son. The police showed up notwithstanding the fact that the parent had spoken with Mosely and had told her that the problem had been solved, and the parent had decided not to file charges. The school held a meeting with Mosely on March 14 to discuss the matter; information emerging at that meeting revealed that the other child had started the incident. A school official refused to give Mosely a copy of the police report.

Mosely attended another meeting at the school on April 10 with the principal of the school, Mrs. Grissett, several school faculty members, two police officers, two parents, Melvin and his father, and three young men who claimed to have overheard Melvin threatening to slash the tires on two

cars. On that occasion, one teacher said that she had heard a month earlier that Melvin was going to bring a gun to school. Mrs. Grissett insisted that the teachers file charges against Melvin. They complied and filled out police reports, but they did not give copies of their reports to Mosely. Instead, they gave her only the numbers of the reports and told her to go to the police station to obtain her copies. At the end of the meeting, Mosely took Melvin outside, and Melvin burst into tears.

At the beginning of the next school year, in September 2001, Mosely decided to home-school Melvin. He has not attended the Chicago Public Schools since October 2001. The schools were slow in giving Mosely Melvin's school records. Mosely claims that as a result of the false accusations that had been made against him, Melvin was denied a public school education and developed problems in trusting adults. In an amended complaint, Mosely added the allegation that Melvin was now "forced to be enrolled in the GED program instead of having a normal education like most kids."

While all of this was going on with Melvin, Mosely was taking—or trying to take—an active role in school governance. In October 1999, Mrs. Grissett informed Mosely that the school needed to have a parent serve as chairperson of a committee the school had for purposes of the Improving America's Schools Act (IASA), Act of Oct. 20, 1994, Pub. L. No. 103-382, § 1; see 20 U.S.C. § 6318. Mosely was elected IASA chairperson for Gompers for the 1999-2000 and 2000-2001 school years. It turned out, however, that her position was nominal at best. She was expected to sign off on the school's budget and design plans, even though she had no background information about them. She suspected that her signature was forged on some documents, as she received awards and letters of appreciation relating to projects she knew nothing about.

Matters took a turn for the worse at a meeting on April 5, 2000, where Mosely was passing out flyers at the request of another person. While she was doing so, the resource teacher signaled to the police to have Mosely removed from the premises. Shortly thereafter, Mosely attended a meeting at the school about the IASA committee, where she got the impression that the faculty found her chairpersonship amusing. The pattern of insufficient information continued into 2001. When Mosely began asking pointed questions about the budget, the harassment of Melvin escalated. On June 6, Mosely was hospitalized for a nervous breakdown that resulted from the stress she and Melvin were experiencing; shortly thereafter, she turned to the courts.

## II

The IDEA case, No. 03-4074 in this court, was assigned to District Judge Suzanne B. Conlon. In response to a motion from the defendant Board of Education, the district court dismissed the case without prejudice in an order docketed on October 23, 2003. It explained that Mosely had "fail[ed] to allege she exhausted IDEA's administrative remedies. This is a fatal defect, precluding this court's jurisdiction." The retaliation case, No. 03-4120 in this court, was assigned to District Judge Matthew F. Kennelly. In an order granting the Board's motion to dismiss, he construed the complaint before him as raising issues related only to retaliation against Mosely personally, as opposed to actions taken against Melvin. The acts of retaliation that involved Melvin had occurred between October and November 2000, a time period more than two years before Mosely filed suit in July 2003. If Mosely were trying to assert Melvin's rights, the court reasoned, she brought suit too late. Viewed as a case about her own experiences, Mosely was complaining only about the denial of information pertinent to her position as IASA chairperson. This, in the court's view, did not "amount

to sufficiently adverse action to form the basis for a lawsuit."

## III

Before reaching the merits of either appeal, there are two preliminary questions we must address. The first, which relates only to No. 03-4074, concerns the perennial problem of our appellate jurisdiction over a dismissal without prejudice; the second (to which Judge Kennelly alluded) relates to Mosely's ability to bring a *pro se* action on behalf of her child.

In *Hoskins v. Poelstra*, 320 F.3d 761 (7th Cir. 2003), we distinguished between dismissing a complaint without prejudice, which normally is not a final disposition, and dismissing a case without prejudice, which is more likely to be final for purposes of 28 U.S.C. § 1291. *Id.* at 763. One way that we can assure ourselves that the necessary finality for appeal exists is by looking to see if any amendment that the plaintiff reasonably could offer would resuscitate the case. If the answer is no, then the words "without prejudice" do not have much meaning. Similarly, if a new suit by the plaintiff would be barred by the statute of limitations, it is safe to say that the previous disposition is final for purposes of appeal. See *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 923 (7th Cir. 2003).

Because the IDEA itself does not contain a limitations period for appeals, we have held that we must borrow the time period provided for the most analogous state claim. See *Powers v. Indiana Dept. of Educ., Div. of Special Educ.*, 61 F.3d 552, 555 (7th Cir. 1995). In Illinois, we have turned to the period set forth in the Illinois School Code, 105 ILCS § 5/14-8.02, which establishes a set of procedures implementing the IDEA. See *Dell v. Bd. of Educ., Township High Sch. Dist. 113*, 32 F.3d 1053, 1059-60 (7th Cir. 1994). Among other rules for obtaining judicial review of adminis-

trative decisions, the Illinois Code provides a statute of limitations of 120 days. 105 ILCS § 5/14-8.02(k). As Melvin has not been in the Chicago Public Schools since October 2001, and Mosely's involvement appears to have ended at about the same time, we are satisfied that the dismissal of No. 03-4074 without prejudice here is effectively a final and appealable judgment.

The second issue concerns Mosely's right to proceed *pro se* with an IDEA action on behalf of her child. The short answer, as Judge Kennelly recognized, is that she cannot, unless she hires counsel. See *Navin v. Park Ridge Sch. Dist. 64*, 270 F.3d 1147 (7th Cir. 2001). *Amicus curiae* has conceded that this circuit and others have such a rule. See also *Collinsgru v. Palmyra Bd. of Educ.*, 161 F.3d 225, 231 (3d Cir. 1998); *Wenger v. Canastota Cent. Sch. Dist.*, 146 F.3d 123, 124-26 (2d Cir. 1998); *Devine v. Indian River County Sch. Bd.*, 121 F.3d 576, 582 (11th Cir. 1997). Nevertheless, *amicus* continues, Mosely is entitled to bring the IDEA action on her own behalf. To support this proposition, they rely on the decision of the First Circuit in *Maroni v. Pemi-Baker Reg'l Sch. Dist.*, 346 F.3d 247, 250 (1st Cir. 2003), in which that court concluded that parents are "parties aggrieved" within the meaning of the IDEA, 20 U.S.C. § 1415(i)(2)(A), and may bring suit to protect their own procedural and substantive rights.

We have no trouble concluding that a parent like Mosely may assert her own procedural rights. The statute provides both children and their parents with an elaborate set of procedural safeguards that must be observed in the course of providing the child a free, appropriate public education. See 29 U.S.C. § 1400(d)(1)(A) (FAPE substantive right); 20 U.S.C. § 1415(a) (procedures). Most of our sister circuits take the position that the IDEA thus confers different rights on children and parents: both substantive and procedural rights for the child, and procedural rights only for the parents. See *Collinsgru*, 161 F.3d at 235; *Wenger,*

146 F.3d at 123; *Devine*, 121 F.3d at 576. This is not because parents do not suffer injury-in-fact when their child is deprived of a proper education under the IDEA; to the contrary, the parents normally will be able to show direct financial injury, causation, and redressability. The IDEA specifically authorizes parents to request due process hearings; it allows them to appeal adverse decisions to the state educational agency; and it makes them the ones responsible for exhausting administrative remedies, see generally *Schaffer ex rel. Schaffer v. Weast*, 126 S.Ct. 528, 532 (2005) (describing the "core" of the IDEA as "the cooperative process that it establishes between parents and schools"). This is enough of a procedural interest to entitle Mosely to sue on her own behalf for the alleged IDEA violations that are the subject of No. 03-4074. It is beyond dispute that Mosely is suing for her own injuries in No. 03-4120. We may therefore proceed to the issues on appeal in both cases.

## IV

### A. *No. 03-4074: Exhaustion*

As we noted earlier, the district court dismissed No. 03-4074 on "jurisdictional" grounds because Mosely failed adequately to allege that she exhausted the IDEA's administrative remedies. The district court should not, however, have ascribed such fundamental importance to a failure to allege exhaustion. As the Supreme Court has recently reminded us in *Eberhart v. United States*, 126 S.Ct. 403 (2005), "[c]larity would be facilitated . . . if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority." 126 S. Ct. at 405 (quoting *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004) (internal

quotation marks omitted)). In the past, this court has described the exhaustion requirement found in the IDEA as a claims-processing rule, pointing out that "lack of exhaustion usually is waivable, as lack of jurisdiction is not." *Charlie F. v. Bd. of Educ. of Skokie Sch. Dist. 68*, 98 F.3d 989, 991 (7th Cir. 1996).

A number of consequences flow from this basic fact. First, the district court should not have turned to FED. R. CIV. P. 12(b)(1) when it decided the motion to dismiss. A failure to exhaust is normally considered to be an affirmative defense, see, *e.g.*, *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002), and we see no reason to treat it differently here. That means that the earliest possible time to consider it would normally be after the answer has been filed, if it is possible to decide the issue through a Rule 12(c) motion for judgment on the pleadings. Parties and courts occasionally take short-cuts and present certain arguments through a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), if the allegations of the complaint in the light most favorable to the plaintiff show that there is no way that any amendment could salvage the claim. Mosely's case is not a candidate for that treatment, however. She had no obligation to allege facts negating an affirmative defense in her complaint, see *Tregenza v. Great Am. Communications Co.*, 12 F.3d 717, 718 (7th Cir. 1993) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). There is nothing on the face of her complaint that compels a conclusion that she failed to exhaust. Her case must therefore be remanded to the district court for further proceedings.

B. *No. 03-4120: Retaliation*

The district court dismissed this lawsuit under Rule 12(b)(6) for failure to state a claim. We review that action under the familiar deferential standard of *Conley*

*v. Gibson*, 355 U.S. 41 (1957), under which we take all facts and inferences in the light most favorable to the plaintiff, and we ask whether the complaint gives the defendant fair notice of what the suit is about and the grounds on which it rests. See *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). Mosely's § 1983 claim requires her to allege that a state actor deprived her of a federally-secured right. In order ultimately to prevail on the theory that her First Amendment rights were violated, Mosely will have to show that her speech was constitutionally protected, that the Board took an adverse action against her, and that its action was motivated by her constitutionally protected speech. See *Smith v. Dunn*, 368 F.3d 705, 708 (7th Cir. 2004).

The district court saw two flaws in Mosely's action: first, that the events about which she was complaining occurred more than two years before she filed her suit and were thus barred by the statute of limitations, and second, that the "freeze-out" she endured did not amount to an adverse action because she did not allege any "tangible detrimental" injury. Looking at the latter point first, we think that the district court was too strict. In the analogous context of public employees who allege that their employers retaliated against them based on assertions of First Amendment rights, we have observed that a "§ 1983 case does not require an adverse employment action within the meaning of the antidiscrimination statutes, such as Title VII of the Civil Rights Act of 1964." *Speigla v. Hull*, 371 F.3d 928, 941 (7th Cir. 2004). Rather, "[a]ny deprivation under color of law that is likely to deter the exercise of free speech . . . is actionable." *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000).

Although we have recognized that an employer's actions may not qualify as an adverse effect on an employee's ability to exercise her First Amendment rights where such actions are isolated criticisms, see *Lifton v. Bd. of*

*Educ. of City of Chicago*, 416 F.3d 571, 576 n.3 (7th Cir. 2005), we have also noted that the alleged injury "need not be great in order to be actionable." *Id.* (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). We have allowed a plaintiff to proceed with her § 1983 claim on the basis of allegations of something less than a "tangible detriment," such as an outright discharge, see, *e.g.*, *Muller v. Conlisk*, 429 F.2d 901, 903 (7th Cir. 1970) (mere threat of sanctions may be sufficient to allege First Amendment injury), or even a constructive discharge. See *Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989) (employer's actions "need not be so severe as to amount to constructive discharge–that is, it need not force the employee to quit."). For example, in *Bart v. Telford*, we held that a campaign of minor harassment was sufficient to deter the exercise of free speech. 677 F.2d at 624; see also *DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995) ("a campaign of petty harassment" that includes "minor forms of retaliation" and "false accusations" can be actionable under the First Amendment.); *Pieczynski*, 875 F.2d at 1333 ("Harassment of a public employee . . . violates the First Amendment unless the harassment is so trivial that a person of ordinary firmness would not be deterred from . . . expressing those beliefs.").

In her complaint, Mosely alleges something more than baseless reprimands by school employees. She contends that she was not allowed to participate meaningfully in her role as the IASA chairperson during the 1999-2000 and 2000-2001 school years. She was deprived of all information necessary for any competent evaluation of the school's budget proposals; worse yet, she was asked to rubber-stamp them and to lend her name to something that might have been problematic. In effect, she was prevented from serving as chairperson. Apart from these actions, she alleged that a teacher summoned the police to have her removed from the school on one occasion when she was passing out flyers

inviting parents to attend an IASA meeting. This is an even more direct allegation of action that was designed to chill her free speech. We conclude that the adverse actions she alleged were enough to survive dismissal under Rule 12(b)(6).

The fact that Mosely was a volunteer as opposed to a paid city employee is of little consequence to our analysis. Unlike a procedural due process claim, for which one would need to decide whether Mosely had a "protected property interest" in her position as IASA chairperson, a First Amendment claim raises the question whether the defendants "unconstitutionally retaliated against [her] on account of her protected speech." *McGill v. Bd. of Educ. of Pekin Elementary Sch. Dist. No. 108*, 602 F.2d 774, 780 (7th Cir. 1979). The Supreme Court has made it clear, particularly in the context of at-will employment and a number of non-employment related government benefits, that while a person has no "right" to a valuable government benefit and the government can withhold a benefit for any number of reasons "[i]t may not deny a benefit to a person on a basis that infringes . . . constitutionally protected interests—especially . . . freedom of speech." *Perry v. Sinderman*, 408 U.S. 593, 597 (1972) (holding that the lack of a contractual or tenure right to renewal of employment did not preclude teacher's First Amendment claim); see also *Rankin v. McPherson*, 483 U.S. 378, 383-84 (1987) (finding that plaintiff, who was merely a probationary employee subject to discharge for no reason at all, could be entitled to reinstatement if she was discharged for exercising her First Amendment rights); *Mt. Healthy City Sch. Dist. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977) (although petitioner was an at-will employee and was not entitled to a hearing prior to decision not to rehire him, he could establish a claim to relief if the decision not to rehire him was made by reason of his exercise of First Amendment rights). In *Brown v. Disciplinary Committee of Edgerton Volunteer Fire Department*, 97

F.3d 969 (7th Cir. 1996), we recognized that a volunteer fireman whose direct compensation was nominal could nonetheless sue for a deprivation of his First Amendment rights. See *id.* at 973-74 (citing *Hyland v. Wonder*, 972 F.2d 1129 (9th Cir. 1992) (experience and status that often accompany a volunteer position can make it a benefit or privilege that could be taken away unconstitutionally)). Similarly, although Mosely may not have had a right to her unpaid position, she cannot be muzzled or denied the benefit of participating in public school governance because she engaged in constitutionally protected activity.

Apart from the fact that the statute of limitations is also an affirmative defense, there are other problems with the district court's conclusion that her retaliation action was untimely. Even if the incidents relating to Melvin occurred more than two years before she filed this case, Mosely's complaint recounted other instances of harassment that took place within the two-year time limit. In response to the court's question, "through what period of time do you contend that your son was being harassed," Mosely responded "up until I took him out the school." That date was September 18, 2001. To the extent that her claim is based on incidents that occurred between July 16, 2001, and September 18, 2001, it is not time-barred, because she filed her complaint on July 16, 2003.

We do not exclude the possibility that discovery may reveal that Mosely is unable to prove that acts of harassment took place within that critical window of time. She has alleged, however, that they did, and that is enough for purposes of Rule 12(b)(6).

**V**

We conclude, in summary, that Mosely is entitled to sue as a parent whose procedural rights under the IDEA were infringed, but she cannot represent Melvin as long

as she remains *pro se*; that the district court should not have dismissed her IDEA case as jurisdictionally barred based only on the fact that she did not anticipate the affirmative defense of exhaustion in her pleadings; that she has alleged enough of an adverse action to continue with her retaliation claim; and that the retaliation claim is not so obviously time-barred that it may be dismissed under Rule 12(b)(6). These two cases are REVERSED and RE-MANDED for further proceedings consistent with this opinion.

A true Copy:

      Teste:

                  _____
                  *Clerk of the United States Court of*
                  *Appeals for the Seventh Circuit*