In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 06-2168 & 06-2516

ROLLIE SPRINGER, *et al.*,

*Plaintiffs-Appellants,*
*Cross-Appellees,*

*v.*

NORMAN DURFLINGER, *et al.*,

*Defendants-Appellees,*
*Cross-Appellants.*

———————

Appeals from the United States District Court
for the Central District of Illinois.
No. 03 C 1200—**John A. Gorman,** *Magistrate Judge.*

———————

ARGUED SEPTEMBER 6, 2007—DECIDED FEBRUARY 29, 2008

———————

Before FLAUM, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.*  This "civil rights" case is about disgruntled parents who disliked their daughters' high school softball coach. After voicing their complaints to school administrators and receiving what they perceived to be an unsatisfactory response, Rollie and Cynthia Springer, and Ross and Carla Collins, interpreted a handful of normal events to be adverse, retaliatory acts on the part of the school. They filed a § 1983 lawsuit against the school

district, its board members, and high school officials, claiming that they were retaliated against in violation of the First Amendment for having complained about the coach. Because the parents offer absolutely no evidence to support their theory of retaliation, the district court's summary judgment in favor of the defendants is affirmed. Additionally, the plaintiffs are ordered to show cause as to why they should not be held responsible for the defendants' costs and attorneys' fees on appeal.

## I. HISTORY

Mr. and Mrs. Springer and Mr. and Mrs. Collins were unhappy with the way the coach of their daughters' high school softball team, Stacy Whitcomb, had handled things during the previous, spring 2001 season. In December 2001, the parents, through an attorney, requested a meeting with administrators of Morton Community High School. On January 30, 2002, the parents, along with their attorney and a local newspaper reporter, met with the superintendent of the Morton Community Unit School District 709, Dr. Norman Durflinger; the school district's attorney, Dennis Triggs; the principal of Morton Community High School, Teresa Lane; and the school's athletic director, Greg Prichard.

The parents told the school officials that they suspected that Coach Whitcomb had been suppressing the skills and abilities of their daughters, Laura Springer and Katie Collins, in order to showcase Whitcomb's younger sister, Sammi, a pitcher on the team. They accused Whitcomb of doctoring statistics to favor her sister, and complained that Whitcomb had been abusive to umpires, parents, team "boosters," and players. They felt that Whitcomb was

doing a poor job of coaching the team and that she was not a positive role model image for their children. Mr. and Mrs. Collins were particularly upset that their daughter, Katie—the team's other pitcher—was not selected for Mid-Illini Conference honors, and they blamed Whitcomb for intentionally botching the nomination process.

Superintendent Durflinger committed to investigating the concerns raised by the Springers and Collinses. Within a month, the district responded to the parents' attorney with a report prepared by Triggs, who had followed-up on the complaints, talked with Coach Whitcomb, contacted an umpire, reviewed player statistics as reported by Whitcomb and the local newspaper, and inquired into the award process for the conference. Ultimately, Triggs concluded that there was "no evidence warranting disciplinary or other employment action" with respect to Whitcomb. He assured the parents' attorney that "School Administration and the softball coach herself are committed to making sure that no player, including Ms. Katie Collins, will be the subject of unfair treatment."

According to the parents, the school undertook specific actions in retaliation against them after they raised their concerns, effectively punishing them for speaking out against Coach Whitcomb. They cite, for example, the school board's failure to respond to two written requests the parents made to meet with the board about the softball situation. Yet, the parents acknowledge that they never took it upon themselves to appear before the school board to present their concerns at any of the board's 22 regularly scheduled, public meetings between January 30, 2002, and the end of the 2001-2002 school year.

The parents point to other happenings in the spring of 2002 that they believe evince a retaliatory scheme. On

one occasion, the parents started a conversation with a school teacher, who cut the encounter short by saying school administrators instructed him not to have contact with the parents. Along the same lines, the parents said that members of the softball community disassociated from them after the January 30 meeting. And although they did not volunteer to serve as ticket takers, announcers, or parent boosters during the 2002 softball season, the parents were perturbed that neither Coach Whitcomb, nor the school, asked them to serve in such capacities.

Certain events surrounding the softball games themselves were also perceived by the parents as retaliatory. At the start of the softball season, the school implemented a new policy—applicable to the public in general—that prohibited videotaping from behind the backstop at the catcher's position. Mr. Collins had previously taped games from that vantage point. The school installed a wind tarp on the backstop, which impeded visibility from certain viewpoints. At one game, a school administrator asked Mr. Springer to leave the area behind the backstop. The request was made peacefully and Mr. Springer moved away from the area. During another game, Coach Whitcomb told Jack Gross (the newspaper-reporter friend of the parents who also attended the January 30 meeting) to get off the playing field—where he had been taking pictures of the game.

The parents also felt that Coach Whitcomb was to blame when Laura Springer got hit in the head by a softball during practice on May 8, 2002. Laura was catching at home plate while Whitcomb was hitting balls to the infield. The drill had been done in prior practices, and Laura knew the ball would be coming to her from first base. At some point during the drill, Laura failed to see the ball coming and it hit her in the head. Whitcomb was a

couple feet away from Laura at the time, standing along the first base line (as she is left-handed), with a bat in her hands.

At the end of the 2002 season, the Springers and Collinses missed the awards ceremony "banquet" (not a banquet in the traditional sense of the word as no food was served and the entire event lasted less than thirty minutes). The parents' daughters had been told via the softball team's "phone tree" (through which team members called each other) that the banquet would start at 7:30 p.m., when it actually started at 7:00 p.m. However, for some inexplicable reason, neither of the families went to the banquet at 7:30, when they purportedly were told it started.

Finally, a year after the contentious 2002 softball season ended, Coach Whitcomb talked with an Indiana University ("IU") softball coach, Sarah Hayes, about Katie Collins. The conversation happened at an Illinois State University softball game that Whitcomb, the Collinses, and Hayes all happened to be attending. At the time of the conversation, Katie had already been offered a spot on the IU softball team for her upcoming freshman year, but she had not been offered a scholarship. The Collinses did not hear the conversation between Whitcomb and Hayes, but Mr. Collins videotaped it from a distance. Whitcomb testified that she told Hayes that Katie Collins was a great kid. Whitcomb pointed out to Hayes that she could see Mr. Collins videotaping them, and then Whitcomb said, apparently referring to Mr. Collins, "I just recommend keeping good records and document[ing]."

Coach Hayes said in her deposition that she remembered leaving the conversation with the impression that Katie was "an awesome person and a good—had very

good character, a really hard worker." She also recalled "leaving there feeling as though . . . Katie's parents were a little bit overbearing." After some follow-up respecting the Collinses, the IU coaches decided that there was nothing to be concerned about, and Katie played for IU her freshman year. Katie was not offered a scholarship because, according to Hayes, "she was at the athletic level of a walk-on."

As a result of the scattered incidents following the January 30 meeting, the Springers and Collinses filed a civil-rights suit, *see* 42 U.S.C. § 1983, against Durflinger, Whitcomb, Prichard, Lane, and the school board members, in their individual and official capacities. The parents argued that the school and its employees retaliated against them in response to an exercise of free speech, in violation of the First Amendment. The parents also raised a claim alleging violation of the Equal Protection Clause of the Fourteenth Amendment, and a claim for intentional infliction of emotional distress. The defendants raised numerous defenses in response, including qualified immunity, and moved for summary judgment.

The district court found that the Equal Protection and intentional-infliction-of-emotional-distress claims had no merit, and it summarily rejected all claims against the school board and its individual members. With respect to the remaining defendants, the district court decided that the parents had standing to bring the First Amendment retaliation claim, and that they were engaged in constitutionally protected speech when they presented their complaints about the softball program to Morton's administrators on January 30, 2002. However, the court did not decide whether the alleged retaliatory conduct violated the parents' First Amendment rights—a full inquiry into that

issue was unnecessary because the court granted the defendant's summary judgment motion based on the utter "dearth of evidence" demonstrating retaliatory motive. The district court also articulated a second ground for granting summary judgment: qualified immunity based on the fact that reasonable school officials would not have known that the events following the January 30 meeting would violate a person's clearly established constitutional rights.

The defendants pursued attorneys' fees in the district court action. The court denied the petition for fees and costs. In doing so, the court noted that it based summary judgment on "the insufficiency of evidentiary support for several key issues" and that it did not find that "plaintiff's complaint was frivolous or brought in bad faith."

## II. ANALYSIS

On appeal, the parents argue that the district court erred in granting summary judgment for the defendants because there is a genuine dispute as to whether the events following the January 30 meeting were undertaken by school officials in retaliation against the parents. They also argue that the district court erred in deciding that the defendants were entitled to qualified immunity. The defendants cross-appeal the district court's denial of attorneys' fees and costs.

To prevail on their § 1983 retaliation claim, the parents need to prove (1) that they were engaged in constitutionally protected speech; (2) that public officials took adverse actions against them; and (3) that the adverse actions were motivated at least in part as a response to the plaintiffs' protected speech. *Mosely v. Bd. of Educ. of Chicago*, 434 F.3d 527, 533 (7th Cir. 2006). The parents

proffer no evidence whatsoever that any of the events they perceive to be adverse were motivated as a response to the January 30 meeting. Because this appeal can be disposed of on that ground alone, we need not decide whether the district court erred with respect to the first two prongs of the retaliation analysis, or in its qualified immunity and standing determinations. *Smith v. Potter*, 445 F.3d 1000, 1009 n.20 (7th Cir. 2006) ("[B]ecause we need not resolve this issue to dispose of [the] appeal, we reserve judgment . . . ."); *United States v. Espinoza*, 256 F.3d 718, 728 (7th Cir. 2001) ("Because we find this issue to be dispositive of the appeal, we need not address the parties' other arguments . . . ."). We thus turn to the district court's summary judgment decision, which we review *de novo*. *Lummis v. State Farm Fire & Cas. Co.*, 469 F.3d 1098, 1099 (7th Cir. 2006).

Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions to file, and affidavits, and where the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). " 'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.' " *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (quoting *Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)). In determining whether a genuine issue of material facts exists, all facts are construed in favor of the nonmoving party, in this case the plaintiffs, Mr. and Mrs. Springer and Mr. and Mrs. Collins. *See Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 780 (7th Cir. 2007). "But our favor toward the nonmoving party does not relieve it of the obligation to 'do more than simply show that there is some

metaphysical doubt as to the material facts.' " *Waukesha Foundry, Inc. v. Indus. Eng'g, Inc.*, 91 F.3d 1002, 1007 (7th Cir. 1996) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

There is a *dispute* here in the generic sense—the parties adamantly dispute the explanations for the various events that occurred after the January 30 meeting. The parents argue that the events were fueled by the school's retaliatory motives. The school officials, on the other hand, say they made policy decisions based on factors wholly distinct from the Springers' and Collinses' complaints. This disagreement centers on the parents' speculation about the school's retaliatory motives. But, "[i]t is well-settled that speculation may not be used to manufacture a genuine issue of fact." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001); *see also Borcky v. Maytag Corp.*, 248 F.3d 691, 695 (7th Cir. 2001) ("The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment . . . . Speculation will not suffice." (internal citations and quotation marks omitted)).

The parents' argument in opposition to summary judgment boils down to an allegation that defense witnesses are lying and the stated reasons for the school's actions are phony. They argue that there are "two sides to every story, which makes this a perfect credibility case for a jury to decide." The parents correctly note that evaluations of witness credibility are inappropriate at the summary judgment stage. *See Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007). However, when challenges to witness' credibility are *all* that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is

proper. *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998) ("[T]he prospect of challenging a witness' credibility is not alone enough to avoid summary judgment.").

As we have said before, summary judgment " 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.' " *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)). Here, all the plaintiffs have to go on is a collective hunch about the defendant's motives, which in itself will not survive a motion for summary judgment. *See Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors, and '[d]iscrimination law would be unmanageable if disgruntled employees . . . could defeat summary judgment by affidavits speculating about the defendant's motives.' " (quoting *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991))).

The parents have no personal knowledge of the defendants' motives for each act, nor can they point to documents, statements, or other proofs of retaliation. In response to deposition questions about whether they could prove retaliation, the parents revealed the speculative nature of their theory: "my common sense tells me it was"; "I felt that was obvious . . . no one told me that."; "They don't have to tell me. They did it."; "I don't believe that Norm stated that it was in retaliation. It was only a concurrence of situations that happened during the season to be able to put that together . . . . Nobody has stated that it was retaliation"; "I believe their actions were,

yes, retaliations against us after that meeting."; "It was what they did, not what they told."; "Actions speak louder than words."; "they didn't call it anything . . . they just did it."; "I didn't have to ask. I knew why." These statements exist—highlighting the complete lack of evidence—for every single alleged retaliatory act.

Without actual proof of retaliation, the parents ask us to infer from the timing of the events (after the January 30 meeting), that there is a genuine issue of material fact. "However, as we have stated on many occasions, 'timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim.'" *Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 685 (7th Cir. 2007) (quoting *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007)); *see also Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) (" '[M]ere temporal proximity' is not enough to establish a genuine issue of material fact." (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002))).

The parents argue that the few available scraps of circumstantial evidence, when pieced together, prove retaliation. They cite *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900 (7th Cir. 2006), for the proposition that " 'a number of weak proofs can add up to a strong proof.'" *Id.* at 903 (quoting *Mataya v. Kingston*, 371 F.3d 353, 358 (7th Cir. 2004)). In *Sylvester*—a retaliation case in the employment context—the plaintiff was fired shortly after having made a sexual harassment complaint; her employer had just given her a positive performance review; and the board authorized her termination depending on how she reacted to the firing of other sexual harassment complainants. *Id.* at 905. What distinguishes this case from *Sylvester* is the nature of the circumstantial evidence: the timing,

unusualness, and severity of the employer's acts in *Sylvester* combined to create a genuine issue of material fact about retaliation.

In contrast, the type of circumstantial evidence in the instant case is totally unremarkable because of its normalness. Each of the alleged retaliatory events—and the combination of events like these—predictably occur in high schools around the nation every spring. Schools improve their fields and backstops, react to complaints by implementing new policies that affect some parents more than others, and respond to disruptive parents and spectators as a matter of course. Some parents are chosen to be team boosters, while others are not. Some parents avoid others who are seen as complainers, or with whom they disagree about how a sports team should be run. Inattentive kids playing sports get hit by balls. Details about sports banquets get muddled when students call each other. Teachers are told not to talk to certain parents when attorneys are involved in the situation. One coach shares her personal opinions about a player and the player's family with a prospective coach—an act akin to a former employer giving a negative reference to a prospective employer, which typically enjoys some form of qualified immunity. *See, e.g., Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 171-72 (7th Cir. 1993). We cannot infer that these separate incidents— which easily could have happened to numerous softball families in high schools across America last season— amount to circumstantial evidence of retaliation. *Cf. East-Miller v. Lake County Highway Dept.*, 421 F.3d 558, 564 (7th Cir. 2005) ("Inferring race discrimination from these minor incidents . . . requires a huge inferential leap that we will not take.").

Based on the evidence before the district court, or more accurately, the "dearth of evidence" that the acts after the January 30 meeting were undertaken in retaliation, the facts are wholly insufficient to allow a jury to find in favor of the parents. Thus, summary judgment was proper.

As for the district court's denial of the defendant's petition for fees and costs, we do not find an abuse of discretion. *See Cruz v. Town of Cicero*, 275 F.3d 579, 591 (7th Cir. 2001) ("This court reviews a district court's award or denial of fees . . . using the deferential abuse of discretion standard . . . ."). The district court specifically noted that the complaint was neither frivolous, nor brought in bad faith. If we were in the district court's position, considering the facts in the first instance, we may well have come to a different conclusion regarding an award of attorneys' fees. It may have been error— considering the deficiency of evidence—to allow this case to proceed to the discovery phase in the first place. But given that the parents did make it to discovery, they cannot be faulted for trying, but ultimately failing, to gather sufficient evidence of retaliation.

That being said, we are not at all sympathetic to the parents' appeal. They have never been able to point to one shred of evidence demonstrating retaliation. To insist that there is a genuine issue of material fact in this case is beyond the pale, and an appeal arguing as much is frivolous. The parents may have caught one break from the district court, but we are not inclined to give them another one. "[A]ppeals such as this not only bring the courts into disrepute but also divert scarce judicial time from other litigants who have serious claims or defenses." *Schlessinger v. Salimes*, 100 F.3d 519, 523 (7th Cir. 1996). We therefore order the plaintiffs to

show cause, within 10 days after the conclusion of this appeal, as to why they should not be required, under Rule 38 of the Federal Rules of Appellate Procedure, to pay the defendants' costs and reasonable attorneys' fees on appeal.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court. Moreover, we ORDER plaintiffs to show cause why they should not be sanctioned for filing this frivolous appeal.